Court. My name is Thomas Nzilmo Jr. and I'm here with Ms. Deborah Fishman and Mr. Joshua Clayton on behalf of the Defendant Appellants, the Jefferson Parish, the Jefferson Parish Council, as well as its council members, both in their individual and in their official capacities. Your Honors, we're here to request that this Court reverse the District Court's decision to the extent that it granted a preliminary injunction and dismiss the JCHCC's or the Plaintiff Appellee's suit for lack of subject matter jurisdiction. As a threshold matter, the Parish submits that the District Court did not have subject matter jurisdiction to hear this case. And as explained in our briefs, JCHCC's putative claims are so implausible that they present no substantial federal question. And we submit that they were made solely for the purpose of obtaining jurisdiction in the federal courts. May I ask you a question that's not designed to throw you off of where you want to head? The way that the injunction was written, if you will, injunction issued, but leaving a back door, so to speak, that if the showing was made by the Parish that the putative or potential clients, those who would get services, that those needs were taken care of, the injunction dissolves. So understanding that the big ticket dispute between the parties over the eviction and the lease and so on and so forth, but when I first read it, I thought that's what it was about. This is an expedited appeal, so I thought I read somewhere in one of your responses that whoever the successor in the lease or whatever was assuming these responsibilities in terms of taking care of patients, et cetera. So is that still a live issue, I guess I'm saying, in terms of whether or not and to what extent those recipients are taken care of? Even if your answer is well taken care of, does that dissipate the injunction on its face or is that still kind of an issue? Do you understand, I'm not expressing it clearly, but the wording of the injunction was a little bit different than you know. Yes, Your Honor, it was. And we would answer that Access Health Louisiana, pursuant to the resolution that this Court took judicial notice of, they have been selected by the Parish to take over the two facilities and begin providing the same services that JCHCC was providing. Access Louisiana has been approved by the federal agencies that fund the services for these people? Yes, Your Honor. They are an FQHC, to kind of use the acronym of a federally qualified health center, but one important thing to note is that this resolution, the most recent resolution that selected them, does not require that they be an FQHC, and that's more just for reimbursement purposes from the federal government. However, they're still required to provide the same services. Now, Access Health is an FQHC, but pursuant to the resolution, they're not required to, but again, that's more for reimbursement purposes and not for the type of services that Access Health would provide. My question is, have they been approved to receive the funds necessary to provide the services that the JCHCC was providing before? Sure, and to answer your question, it's my understanding that I'm not aware that the service area competition has been decided upon as to who would get the federal funds, but Access Health is established in other parts of the parish and in other parishes. And so whether or not they would get this funding, it doesn't limit their obligation to provide the same services to the citizens in Jefferson Parish, and in fact, they already do provide those services just in other parts of the parish. So regarding the implausibility of the claims, really there's several reasons why these claims are so implausible that subject matter jurisdiction does not exist. First, this is a local lease dispute, Your Honors. I mean, this was an issue where we have two leases that were coming up. Well, one especially was coming up on its termination date, and the parish provided notice pursuant to the contractual provisions, and the parish council ultimately voted to adopt or pass a resolution that would affect the termination. The other lease, it was a month-to-month, and they had to provide 30 days' notice, and notice was done. So this really is just a local lease dispute between a lessor and a lessee. Next would be the two resolutions that were passed. Those were just a local legislative body's discretion in passing them with localized concerns. It's the parish's governance of public affairs that really keeps this a local matter and not one that would bring this into the federal realm. Also, neither a Pele's receipt of federal funds nor their use of parish-owned facilities to provide these services warrants federal interference in the parish's governance of these affairs. The parish itself, as I understand it, has no legal obligation, state or federal, but here we're under the Medicaid Act, to provide these services. Is that right? I mean, the parish just came in and voluntarily allowed the facilities to be used in the wake of Katrina? Yes, Your Honor. Correct me if I've got it wrong. No, you have it correct. That is it exactly. I mean, the parish from the very beginning could have said, we're not going to be involved in providing these particular services under federal law, and that would have been the end of it. Yes, Your Honor. But by providing free facilities and a lease, now the parish is being sued because it wanted to discontinue the lease into which it voluntarily entered. Correct. Yes. And again, the district court's decision really opens the floodgates for parish contractors who receive federal funds to turn local disputes, local lease disputes, into federal disputes. You envision these floodgates. Yes, Your Honor. You don't have any concrete evidence. Correct. There's been any floodgates. No lawsuits have been filed in the four months or three and a half months since the injunction went into effect, but yes, Your Honor. And again, the district court's decision in effect creates a lease in perpetuity under federal law because the initial term of the Morero lease, it's expired, and yet the parish is not allowed to make them leave. The termination was pursuant to the specific provision of the lease. Yes, Your Honor. It said that, what, was it July 31st, whatever the date was? Correct. It was the Morero lease had an initial 10-year term set to expire on July 31st, 2016, and it would automatically renew unless either party provided written notice 60 days in advance. And in this case, the parish provided notice, and the district court found that that notice was properly provided 109 days prior. What would happen to those, how much would it, one and a half million dollars improvement that the JCHC made? Well. What happens to that when you terminate a lease, or did that change the lease in any respect? Well, it wouldn't, and in fact, just, and forgive me, that's not something that I truly examined when looking at the cooperative endeavor agreement, but under Louisiana lease law, it depends on the type of improvement that's made. The chairs, a lot of the equipment that would go with JCHC to the new facility that they've opened up, but there's some things that I believe would become part of the structure itself, and the cooperative endeavor agreement between the two parties, it really didn't address who would own the improvements. The lease is silent as to improvements? I believe it is, Your Honor. But again, no rental has been charged. Correct. These were rent-free leases. Yes. Was rent being charged before? No. I mean, during the duration of these leases, no rent. But the facility was vacant before this, is that right? It was county-owned, but it, excuse me, parish-owned, but it was not being occupied at the time. Your Honor, I have to admit I do not know the answer to that question. I thought I saw that in the briefs, but maybe I didn't. Furthermore, the claims that JCHC has asserted, they strike at the heart of legislative immunity and legislative privilege. Well, your problem there is you didn't raise legislative immunity in the district court, so you've waived that issue. It is a waivable issue. It's not jurisdictional. Also, the state constitution waives your sovereign immunity on contractual claims like this, I think. And yes, your Honor, I would agree, if I can address both. The week, or I should say the week that the complaint for declaratory action injunction was filed, the preliminary injunction was heard that week, that Friday. And the day, really the night before the hearing, we had filed, in addition to a memorandum in opposition to the preliminary injunction, we filed a motion to dismiss based on legislative immunity. And the district court did not hear it. And the opposing counsel then filed a motion to dismiss because they filed an amended complaint that was filed really after our notice of appeal was filed in this case. And the judge denied it as moot because the amended complaint substantially rewrote the claims that were asserted. And so the question of legislative immunity, I would not say that it's waived because, just as of right now, the court has indicated that it's moot based on the filing of the amended complaint. What I hear you saying is, correct me if I'm wrong, that you did everything you could to raise it in the limited amount of time, but it got put on the sideline because of the procedural posture of the case. Yes, Your Honor. When you urge legislative immunity, are you, do you mean, I thought you were talking about the counsel being entitled to sovereign immunity. You're not talking about the individual members of the counsel having immunity while they're in session or anything like that, are you? The immunity that we have asserted is based on the act of voting on the two resolutions. And so this really isn't a contractual claim that has been asserted. They have alleged that the two resolutions that authorized the termination of the leases is unlawful. And so the reason for the legislative immunity is the basis of this claim is an inquiry into the motivations of the counsel members as to why they voted on these resolutions. And the power submits that legislative immunity in the Bogan case, in the Hubbard case, specifically apply in cases such as this that protect. You're not talking about the immunity for the counsel itself to be immune from this lawsuit? Well, the counsel itself I don't believe could be immune, but the legislators themselves would absolutely. Did the plaintiffs ask for damages or anything from the individual members of the counsel? They have not asserted a claim for damages, but it's a retaliation claim, and it falls squarely in line with Bogan and Hubbard. I hope that answers your question. Thank you. In the limited time that I have, I do want to address- Let me answer this. Yes, Your Honor. Obviously, I guess, I mean, this is an expedited hearing for us. One, two, three, four, five, six, seven. You know, we've got seven lawyers in the courtroom here, you know, dealing with this matter. You say it's a lease issue. You know, they say it's a bigger issue. This matter was not susceptible to resolution other than federal court lawsuit and having us three judges construe a lease. In other words, in the interim of this lawsuit, have the parties been engaged in trying to resolve this matter short of, you know, a full-blown opinion on a lease and these issues? Your Honor, with the exception of some motions that have been filed, there has been really no communication between, as far as I know. Well, I know between counsel is concerned, but I'm not aware of any communication between the parties. I assume, and I'll ask, you know, opposing counsel the same thing when we get the chance, but I assume that part of the problem with trying to settle the matter now is that it's a 1983 issue and that there will be a claim for attorney's fees even if the matter is settled. Yes, sir. Has there been a pleading for attorney's fees in the initial action? Not in the initial complaint. That's before this court. Okay. Your Honor, I see my time is up. All right, Ms. Townsend, we'll reserve your rebuttal time. Thank you. All right, Mr. Freitas. May it please the Court, Matthew Freitas on behalf of Jefferson Community Health Care Centers, along with my co-counsel Robert Garrity and colleagues David Bender and Jornade Foster. Is this about a lease and eviction? No, Your Honor. This is about disturbing retaliatory conduct against a nonprofit health center that's trying to serve a desperately underserved and starved community for health care resources. This is about the patients. It's not about attorney's fees. It's not about damages. And I think what we saw from the court below was a very carefully crafted injunction. I think one of your honors mentioned not your norm, but I think that's to the district court's credit, that she targeted the harm that she was most concerned with, and that harm was the harm to the patients. Let's take a hypothetical. I understand this is not the facts of this case, but let's take a hypothetical. Let's assume that in the wake of Katrina, there was a difficulty in finding facilities to provide these Medicaid services. Let's further assume that the parish had this particular facility vacant and not under lease and no plans to use it. Would your client or anyone else be able to come into federal court under 1396AA or any other federal statute and claim that the parish was under an obligation under the emergency circumstances of Katrina to provide, to give a lease for its vacant facilities? Absolutely not, Your Honor. The reason we're here is because they made the space available, and then they threatened to take it away through plainly unlawful conduct. So there were constitutionally protected interests in that contract, that lease, that cooperative endeavor agreement. To Judge Stewart's point about whether- I thought there was a termination clause with a notice that was given under the lease. There was, Your Honor, but that clause has implicit in it a duty of good faith and fair dealing, which is existent in contract law in general. It's existent in Louisiana state law to be applied to every single contract, especially public contracts. And under a contract clause analysis, which I think is fairly presented in our allegations and our complaint, the state or its representatives cannot impair contractual obligations, especially their own. And here, that's why you have to take this later developing fact with a gigantic grain of salt. It is incredibly self-serving, and there's a heightened duty on the state when it takes an action to impair its own contracts. And I think terminating a contract is about as significant an impairment as you can get. Now, if they had a good faith basis for doing it, we wouldn't be here. We have an undisputed pattern and practice of retaliatory conduct that the opposing counsel and their clients made a litigation gamble not to confront. Why didn't they confront it? I think they didn't confront it because it's true. That's what I think, but it doesn't matter what I think. It matters that the district court found that. And I think this court's honor and tradition of honoring those difficult decisions that district courts make has to be upheld here. There's nothing extraordinary here that would— Your question of law, though, whether there was any obligation under 1396AA to provide services. You're suing under a specific federal statute through 1983. And, Your Honor, the reason we're making that claim, and we're making several others, and I would like to add the point that it is notice pleading. Now, ordinarily you don't hear counsel saying notice pleading when you also get a preliminary injunction, but we did get the preliminary injunction. It is notice pleading in federal law. Our claim advances, I think, fairly at least two constitutional contract clause claims, one as to the contract between our client and the federal government to carry out a grant, and the other contract, the contract between the parish and our client. Those are two contracts that are impaired through retaliatory bad faith conduct. But the point about—I'll address, Your Honor, specifically to 1396ABB. The parish signed on to the provision of federally qualified health center services to this area, and they signed a contract that recognized our client as a grantee, Section 330 grantee. And what's critical about that is they know, as a 330 grantee, you get authorization from the federal government to provide the federally qualified health center services on a site-by-site basis. So they signed on to that. They donated basically two of their site—not donated, they pledged two of their sites to this program to provide these services. And then after our client fulfilled its contractual obligation to apply for that grant and to get it and then to fulfill it by providing those services at those sites, had the rug pulled out from under it because they didn't acquiesce to the demands of the council. Well, they granted access to the facility, but that access had lease terms, terms in terms of months and years and a termination clause. So it wasn't granted in some kind of perpetuity. Yes. The notion that this lease would exist in perpetuity, I think, is absurd. This lease would go for another five years if they didn't terminate it properly, and they didn't terminate it properly is our position. But both sides agreed to the termination clause or clauses and to the advance notice that was required. That's absolutely true, Your Honor, with the caveat, which I think is the most important caveat here. It requires good faith. And here there wasn't. There is a pattern, a long history and a pattern of improper behavior by the council. And the reason that the termination was issued, and if we're right about this, in the district court it's a finding of fact. The district court said it's best explained. These resolutions equal retaliatory conduct. That is an improper invocation of the termination clause. So it's a violation of the obligation of good faith and fair dealing under state law. Is that what you're talking about? I think it's contract law in general, state contract law. It's the restatement, which I believe Louisiana has adopted. It really is an inherent duty. Again, that's state law. I mean, I understand some states have an obligation of good faith and fair dealing in contracts and some don't. And I'm not an expert on what Louisiana provides. But either way, there's no federal contract common law unless we're talking about a maritime case or something like that. So you're talking about an obligation imposed under state law of good faith and fair dealing. That particular claim, yes, Your Honor, that is not necessarily the case with respect to this constitutional contract clause. The constitutional contract clause prevents the government from impairing its contractual obligations unless it's reasonable and necessary for a public purpose. All right. So under that theory, if I understand it, and I correct you, I did interrupt you, but let me just continue the train of thought. Under that theory, any time a state or local governmental entity enters into a contract, it is barred by the contract's clause in the federal constitution from handling that contract in a way that violates fair dealing. Is that what you're saying? What are the limits here? That's probably true, Your Honor, but I wouldn't have phrased it that way. I would phrase it as when the state or its local governments pass what they claim to be a law that impairs a contractual obligation that they freely entered into and they do that in bad faith, I don't think we necessarily need to draw upon the state contract law. The Constitution carries its own contract clause body of law, and if the state interferes with a contract through this type of behavior, which is, I'd like to emphasize, it's unrefuted at the district court level. So the finding is these resolutions equal retaliation. So if that is the case, that can't possibly be a good faith or just a proper invocation of termination. Why can't we view this as just a landowner exercising his right under a lease, its lease, to terminate the lease in accordance with the terms of the lease? I'm afraid you have to blame me and my co-counselor for that, Your Honor. That's because we brought 1983 claims. It's also because we're pursuing constitutional claims. So with that, we had the right to choose the federal form and did. There is a contract claim case and a claim in our complaint. We could drop it and continue on in court with the remaining claims. It's there through ancillary jurisdiction, but I don't think it's necessary, and I think it's important, Judge Smith, to get back to your question about 1396. The judge below didn't find that we had an enforceable right under that statute. She said that under these circumstances, situations like this often lead to relief, and what she did was got a case on Monday, had a hearing on Friday, took evidence all day, sworn declarations, documents, exhibits, and then turned out a 55-page decision with three days and two of them were the weekend, saying under these circumstances, I think there is a likelihood of success. I don't think it's fair to tie the district court to any particular claim. I think it's fair to look at every claim, which is why we think you should look at our amended complaint, but even if you weren't to look at our amended complaint because it was filed after the notice of appeal, it presents a number of causes of action and supports a number of causes of action. Our belief, I like our chances. When I see facts like this, we know what it says. This is pay or play politics and retaliation if you don't. Perhaps you misunderstood my question. I was simply asking did the council act simply as a landlord in terminating this lease, or did they pass? You seem to be saying they passed a law. They purport to have passed a law. In the contract that was already in being and that they did not proceed under the contract to terminate the lease. What we're saying, Your Honor, is that their action that purports to terminate the lease was unlawful. The resolutions that they passed to terminate that lease were unlawful acts. The district court equated them to retaliation. Those are best explained as retaliation for failing to acquiesce to unlawful demands. The reason they were passed in resolution was to try to invoke a legislative immunity. On that point, I would say that that's easily inapplicable here because this is the administration of a contract. A number of the acts we allege don't occur anywhere near the council, but there's no case that says merely voting on something doesn't make it legislative. The fact that they went into a four-hour executive session right before this vote, and then the resolution itself says nothing on the face of it as to why they did it, and then that executive session doesn't even have the councilman who proposes the resolutions coming back into the room, shows it's utterly unexplained, but it also shows something really important to legislative immunity. It shows that if this were about policy or if this were about budget, budgetary implications, or if this were about any of the ordinary governance things, it'd be in the open public. There'd be no reason to hide in a four-hour executive session. There are public meetings laws for that very purpose. They're hiding in an executive session because this was a targeted action against a health center that is doing its best to meet the needs of the community, and it didn't acquiesce as it had in the past to improper overtures by this council. It stood up to them. The resolution doesn't contain the reasons for its action? No, Your Honor. The face of the resolution merely says terminated. And to the notion of—sorry, Your Honor. You've done a good job, and I appreciate your responding to our questions about what your causes of action or theories are. As I hear you, your main theory, the one on which if we had to decide today that we were going to affirm the injunction, I'm not saying we will or we won't, but if we were to decide that, what is your strongest theory on which we would do that? It sounds to me as though you think your strongest theory is the federal constitutional impairment of contracts clause. I think it's a combination of the due process claim and the contracts claim. If I were to rank them—and, you know, our apologies. In a hasty proceeding and then an expedited briefing, it was hard. And if we didn't do as good a job as we could, my apologies to the court and our client. But when I reread our complaint, I thought it did a pretty good job of actually asserting a contract clause claim, and I would rank it top, just above the due process claim. And the reason why is because that cause of action imposes a heightened duty on the state when it's a public contract. And so here, the public entered into it. The absence of any explanation just is deafening in its silence. The notion that these parties didn't negotiate, that's because there's no good faith on the other side. That's why we couldn't negotiate. There was an attempted negotiation. It's in the record. It's described as our client going to Councilman Spears and saying, you know, can we come up with a workable solution? There would have been workable solutions. And, in fact, this preliminary injunction is almost, you know, the most ingenious solution that could have been conceived of. What she did was she filled the gap of care that the parish left open. The parish kicked a provider out that was meeting the starved needs of its patients with no explanation, and she filled it so that it won't be a gap. And I think that the actions of the parish proved that the gap was inevitable. If our client were kicked out back in July 31st, there's nobody to replace Jefferson. So fill in a little bit, if you will, please, on your due process claim. Is this procedural due process, substantive due process? Substantive. Substantive due process. Yes, Your Honor. So just the federal courts just do whatever they think is right to uphold the rights of people to get their benefits. I mean, that's kind of a freewheeling theory. I don't know why you say that, Your Honor, but I think it's a little more onerous than that. So what there has to be, it's not the highest hurdle in the world. It's actually probably one of the lowest hurdles for a government to clear. The fact that they tripped and stumbled on it so badly here is their own doing. They don't have a rational basis for their own action. They didn't advance a public purpose. They dramatically disserved a public purpose. So from a due process standpoint, those are hard arguments to make. Granted, they are not easy. But with our facts that are unrefuted below, I feel good about those facts. And I think when you present those facts to a rational fact finder, that's the conclusion that you reach. We know what this is, and it's a due process violation. They don't come along every day. These facts don't come along every day. So if I could, I see I have, just if I could turn my attention to a different point, Your Honor. We had some questions of opposing counsel about attorney's fees. Are you seeking attorney's fees? I mean, Chief Judge Stewart asked a question about whether this can all be resolved, and my suspicion is usually disputes like this can't because attorney's fees is a real stumbling block. Even if a new entity is brought in and the services are being provided, the plaintiffs come back and say, Well, but, you know, we caused these changed circumstances. We're entitled to a bunch of fees here. So where do you stand on asking for or the potential of asking for fees? As I stand here today, I don't have authority to say that they would be waived, but I can represent that I would encourage my client to waive them. I know that my client is not, this is not what motivated this action. This is not about attorney's fees. If you listen to her testimony, well, you can't listen to it, Your Honor, but if you were to read her testimony below, you can tell it's not about attorney's fees. It's about opening the door to her patients that she wants to be seen. Are you going to talk about the interference with the health care laws or the funding of these services? The service area competition point, Your Honor? Yes. If you're going to talk about that, I won't ask any questions. Well, that was the point that I was going to go back to after, as long as Judge Smith is finished with that line. So, yes, I wanted to touch the point about, I was referring to in my notes as the timing point. The facts before the district court showed an inevitable gap of services. There was no one lined up. There was actually solicitations to have someone else come in with no one else there. So there was a guaranteed, inevitable gap. This notion that another Section 330 health center is ready to step in is misleading and incorrect because of the way this program works. If this other provider were not a Section 330 health center grantee, this wouldn't be an issue. If they had another nonprofit provider lined up and could swear under oath, yes, we can step in tomorrow, then, yes, the preliminary injunction could be dissolved. The reason that can't work here and the reason it's misleading to say that this other health center can do that is because of the way the program operates. The service area that Jefferson Parish is in is served by virtue of a grant that is awarded to a particular grantee, and then it's their obligation to serve that area. And the federal government wisely doesn't want to give that grant to another health center and have overlapping responsibilities because that's not a wise utilization of scarce federal dollars. So what they do is they have a service area given to a provider. It's Jefferson Community Health Care Center's obligation to serve it. If they lose that competition, and it would be a tragedy because I think these circumstances would potentially influence it, if they were to lose that competition and this other provider were to win it, then, yes, they would come in and take over the entire service area. Jefferson, my client, would cease to exist as a federal grantee. Conversely, if we were to receive the award in that service area competition, another Section 330 grantee could not come in because that creates the service area overlap. And I know it's painful to read those policies, but this is spelled out in the policies that Your Honor is allowed to be supplemented to the record through the motion to strike exercise. All right, Counsel, as things are on the expedited appeal, let me give you an additional two minutes to either further respond on that point. Ms. Dallin-Zellboe, I'll similarly add two minutes to your time when you come back up. Yes. So the few additional points I'd make on this prior federal approval issue, there is no prior federal approval. No other Section 330 grantee can come in and serve in this area without it. It doesn't exist yet, and we won't know until February 28, 2017 at the latest. Now, typically, there is some heads up. I don't know exactly when it will be, but there will be a decision by the federal government as to who wins that service area award, and then we'll know which Section 330 grantee can come in. The attached points I'd like to make to that are if you're not a Section 330 grantee, if AccessHealth Louisiana were to come into these sites and not operate as a Section 330 grantee, it couldn't have fulfilled the contract that our client entered. If you're not a 330 grantee, you don't then qualify as this thing called a federally qualified health center, and if you don't qualify as that as a matter of law, you can't get the enhanced reimbursement. You can't get the cost reimbursement that allows you then to do the good things with your surplus revenue for the uninsured. You can't get Federal Tort Claims Act protection for your malpractice liability, so you have to buy medical malpractice. You can't get discount drug pricing under the 340B program. You can't get all the bells and whistles that come along with this grant program that help those grantees use their resources most effectively. So if they were to come in not as part of their Section 330 grant, they'd have to prove that it's totally isolated from their grant project, a very, very unlikely scenario, and then they wouldn't have any of those bells and whistles, so they wouldn't do it. But in any event, I'd like to end with the notion that that point ought to be addressed at a district court level. The question of whether a later developing fact is the basis for dissolution is really the district court's concern, and we would discourage this court from addressing that. The real question is did the district court err in issuing the injunction, and our conclusion is it did not, and we'd ask you to affirm. All right. Thank you, sir. Thank you. All right. Mr. Zelma, we're back to you, sir. Thank you, Your Honors, and also thank you for giving this matter expedited consideration. The parish most certainly appreciates it. JCHC talked about this contract claim. The complaint, the original complaint, which was the only complaint before the court, the judge brought up whether or not there was a breach of contract, and the court found that there was no breach of contract, that notice was proper, and so that was just something that I wanted to make sure that the court was aware. Regarding bad faith? Let me just ask you. I mean, you know, it's expedited. We're reading it in a hurry. The briefs were filed, closed, so, you know, none of us sort of have maybe as much of a grip, but within all the briefing there was a whole lot in there about Dr. Williams' testimony, you know, the actions of Councilman Spears, et cetera, et cetera, et cetera, all of this stuff, you know, Council opposite saying, well, overlaying this is bad faith, et cetera, et cetera. So what do you say about all that testimony or whatever? Well, sure, and that was one thing that was brought up as to whether or not that the testimony was unrefuted, and, of course, the parish strongly objects to that. If we would have put a council member on the stand, we would have effectively waived their legislative privilege, and so the issues that were raised and whether or not this was retaliatory, again, we didn't put anybody up because, one. Your case is so strong on just the lease itself. I mean, what is the arbor of, you know, the legislative immunity in the way that it was passed and so on? I mean, if you've got a good lease that gives you the right to evict and so on and so forth, what's the, you know, the error here of this legislative cloak of it being a lease if you say it's just a landlord-tenant, you know, dispute here? The answer is the claim that was asserted in the original complaint, it wasn't that there was a problem with the lease. It was that the resolutions that were passed were unlawful. And so that was the heart of the plaintiff's case, is that the two resolutions, so it's 127020 and I think it was, I'm going to blank on the other one, I apologize. But that is what the claim was unlawful. The act of passing those two resolutions, that was the allegedly unlawful act. And it was brought up at the trial court and it was brought up again in our briefs in that the parish properly held a publicly held meeting, that they voted on this issue in open court. There was reference made to executive session and how there was some nefarious goings on in executive session. Executive session is very limited as far as the type of content that can be discussed outside the public arena, and you also have a specific agenda that needs to be followed. And, Your Honor, that's what happened in executive session could have nothing to do with the passing of these two resolutions to effectively terminate these leases. I think counsel said in answer, I think Judge Smith's question about the resolution that there was no reasons assigned or attached to it, it was just a vote terminated, is that accurate? That is accurate. And, Your Honor, there's no need for a reason to pass these resolutions. Most of the resolutions get passed without a specific reason on the record. And so to claim that one is required is disingenuous because it doesn't happen. There was also an issue that the rug was somehow pulled out from under them. Well, this was litigated at the trial level. It was about notice. It was about the provisions of the contract, and the district court found that the parish properly notified JCHCC that these contracts were coming to an end. They did it for the Marrero contract almost twice as long as is required by the contract. There was no rug pulled out from under them. If anything, this is almost a no good deed goes unpunished because this is what we tried, and we got sued for providing this facility. The district court, in its order, made at least five references to the motive of the counsel in passing these resolutions. And as we briefed, consistent with the court's rationale in Bogan and in Hubbard, that is an improper inquiry that the motives of the legislators in passing the resolutions is irrelevant to the case. And counsel opposite said that the second resolution, the one that names, I forget the name, is it Access Health? Access Health, Louisiana. The one that names Access Health as a successor, if I understand the argument, counsel says the resolution may name them that sort of at best, in other words, they're a nominal successor but not an actual successor because of all the various requirements, et cetera, that a real successor would have to undertake. Do you agree with that, or what's your response? Well, I would say, I guess to begin, no, I do not agree with that. Although this is outside the record, the parish- I was not trying to lead you. Oh, no, no, of course not. But just the parish has already, by way of a subsequent resolution, approved the contract with Access Health. All we need now is the ability to go into this facility so we can start providing health care. Like I said, the contract, it's already been approved. Was that done in- I was just going to ask you, what does this contract do? Does it- Sure. It's not just the lease, it's the providing the- It is providing the same, I'm sorry to interrupt, but it is providing the same health services that JCHCC is providing. And that's subject to future approval by the federal government agencies that are necessary to provide the funds? Well, this contract does not require Access Health to be an FQHC entity, at least for those two facilities. Like I said before, Access Health already is an FQHC for other sites, but this contract does not require it. And that was one thing that was brought up. Does anybody in the federal government have to approve them taking over? No, Your Honor. To provide the funds? What if the federal agency says, we don't think we want Access Health in this particular bailiwick? Sure. The process to get approved, as counsel described earlier, it's about getting reimbursement for the services that you provide. Jefferson Parish, by way of its contract and in selecting Access Health, is not requiring that Access Health be eligible for the reimbursement from the federal government. And so really being an FQHC, it's about money and getting reimbursement from the federal government for the services. The contract between the parish and Access Health focuses on the services themselves. So you and your client have not really been concerned about whether the people who were being served before by JCHCC will be served with federal funds? Correct. You don't care? Correct. We want the citizens to get the medical services. How the entity, the provider, how they provide those services and how they're reimbursed, that's between that entity and the federal government. All right. And again, just to sort of wrap it up, we would ask that the Court please vacate the preliminary injunction and this business matter on subject matter jurisdiction. Thank you, Your Honors. All right. Thank you, counsel, both sides for the briefing and argument. This case will be submitted along with the other oral arguments. We will be standing recess until 9 a.m. tomorrow.